**OLD COLONY TRUST COMPANY, United Ventures, Inc., and Gabriel Powers, Plaintiffs,**

v.

**PENROSE INDUSTRIES CORPORATION, Wm. Penn Broadcasting Company, Redevelopment Authority of the City of Philadelphia, William H. Sylk, Harry S. Sylk, Jonas Senter, Selma Katz, Sammuel Rosenblum, Simon Rosenblum, Leon J. Obermayer, Conservator, and Walter E. Heller & Co., Inc., Defendants,**

and

**the Borden Company, Intervenor Defendant.**

**Civ. A. No. 42853.**

United States District Court
E. D. Pennsylvania.

Jan. 25, 1968.

Drinker, Biddle & Reath, by Henry W. Sawyer, III, and Walter L. Foulke, Philadelphia, Pa., for Old Colony Trust Co. and Gabriel Powers.

Howard G. Schneider, for Gabriel Powers.

Montgomery, McCracken, Walter & Rhoads, by John S. Estey and Hugh G. Moulton, Philadelphia, Pa., for United Ventures, Inc.

Wolf, Block, Schorr & Solis-Cohen, by Raymond J. Bradley and Michael L. Temin, Arlin M. Adams, Philadelphia, Pa., for William Penn Broadcasting Corp.

Michael H. Egnal, Philadelphia, Pa., and Joel H. Weinrott, Philadelphia, Pa., for William H. Sylk and Harry S. Sylk.

Josef Jaffe, Philadelphia, Pa., for Selma Katz and Samuel Rosenblum.

Alexander N. Rubin, Jr., J. Jerome Sklar, Frank E. Hahn, Jr., and Simon Pearl, Philadelphia, Pa., for the Conservator, Leon J. Obermayer.

Dilworth, Paxon, Kalish, Kóhn & Levy, by William T. Coleman, Jr., Philadelphia, Pa., for Walter E. Heller & Co., Inc.

Joseph M. Field, Philadelphia, Pa., for Martin W. Field.

Israel Packel, Philadelphia, Pa., for Borden Co.

David Berger and Herbert B. Newberg, Philadelphia, Pa., for David E. Milgram.

Walter Stein, Philadelphia, Pa., for P. I. D. C. (Philadelphia Industrial Development Corp.).

VAN DUSEN, Circuit Judge.

### SUR PLEADINGS AND PROOF UNDER COUNT II OF THE COMPLAINT

This case concerns a sale of collateral under Article 9 of the Uniform Commercial Code. It is now before the court after a non-jury trial on the issues raised in Count II of the Complaint: an action seeking a declaratory judgment [1]

---

1. 28 U.S.C. § 2201. Jurisdiction is founded on diversity and the requisite amount in controversy.

that the plaintiffs' sale of collateral was "commercially reasonable" and otherwise lawful.

### History of the Case

The Complaint was filed June 1, 1967, by certain secured parties in this commercial transaction and the trustee holding the above mentioned collateral. The named defendants included various other secured parties, allegedly junior in lien, the debtor, and its subsidiary. Also named as a party defendant was Leon J. Obermayer, who was appointed Conservator by this court with respect to certain assets of the debtor on May 11, 1965, in Civil Action No. 37995. Attached to the Complaint was a contract for sale of the collateral held by the plaintiffs, the common stock of a radio station (the debtor's wholly-owned subsidiary), which contract had been signed May 26, 1967. Count I of the Complaint sought preliminary injunctive relief to enable plaintiffs to consummate the sales contract. After a hearing on June 7, 1967, a preliminary injunction was granted by order of June 8, 1967, and modified after a further hearing June 13, 1967. These orders, declaring that defaults had occurred under the various agreements outlined below, enjoined the debtor or its officers from various acts which would alter the value of the collateral and required their cooperation in providing financial and other information as covenanted in the various security or pledge agreements (Documents 5 and 8). A third hearing was held June 21 on whether to require cooperation of the debtor and its subsidiary with the plaintiffs in their application to the F.C.C. for change in control of the radio station.[2] As had been discussed in the previous hearings, the court also stated its willingness to receive any other firm offers for the collateral radio station stock at this hearing to be used as evidence in deciding the issues under Count II. One such offer by David Milgram and Associates was followed by their motion to intervene as plaintiffs (Document 17 of June 26). After argument and briefing on the issue of what status such offers should have in this case, the court on July 10, 1967, denied the motion to intervene (Document 28), but gave Milgram leave to present argument amicus curiae at the end of the trial on Count II. This decision has been affirmed by the United States Court of Appeals for the Third Circuit, 387 F.2d 939 (January 9, 1968). Inherent in this order was the conclusion by the court that such offers were relevant in this case only as evidence in the determination of "commercial reasonableness" under Count II. A fourth hearing on July 19, 1967, resolved the issue of a possible jury trial and scheduled the trial to the Court for August 23, 1967. The actual trial took 13 days and produced 2027 pages of testimony and over 100 exhibits.

### Discussion

#### A. Facts

Penrose Industries Corporation ("Penrose") is indebted to the plaintiffs, United Ventures, Inc. ("United") and Gabriel Powers ("Powers"). United holds certain "senior notes" currently being $740,000. principal amount of $5\frac{1}{2}\%$ interest-bearing notes. Powers also holds certain notes ("Powers Notes"), being $1,000,000. principal amount. As security for these notes, Penrose pledged on August 20, 1960 and August 21, 1962, respectively, the entire capital stock of

---

**2.** At the June 1 hearing, it was argued that requiring cooperation in the F.C.C. application would effectively eliminate further offers for the collateral stock. It was unclear at that time whether such later offers should be considered by the court and, if so, whether they were merely evidence of the collateral's value or could be used in a judicial sale if it should be held. The problem of additional offers (for the purpose of the requested equitable relief seeking cooperation in such application to the F.C.C.) was moot by July, since the court had set June 21 deadline for such offers regardless of their evidentiary or substantive status. Counsel for the radio station, however, gave additional reasons for not then requiring full cooperation on the F.C.C. application. Accordingly, decision on that part of Count I has been reserved. See below.

its wholly-owned subsidiary, William Penn Broadcasting Company ("WPEN"). The plaintiff, Old Colony Trust Company ("Old Colony"), is acting as trustee for United and Powers under the "Senior Stock Pledge" agreement with United and the "Powers Stock Pledge" agreement with Powers.

Defendants William and Harry Sylk ("Sylks") are the chief officers of WPEN and Penrose and effectively control them both. On January 31, 1962, WPEN issued a debenture ("the debenture") to the Sylks, "acting for themselves and others as their respective interests appear." This debenture was then pledged on August 21, 1962 to United and Powers as additional collateral to secure the debt Penrose owed the plaintiffs (the "Senior Debenture Pledge" agreement and "Powers Debenture Pledge" agreement, respectively). Since December 1, 1964, Penrose has been in default under all these agreements as determined in the findings, and order of June 8, 1967 (Document 5) and as more fully shown at trial. Although the Powers Notes provided for no interest for the first five years, this was waived by Penrose on July 13, 1966 (P-79), when it agreed to pay Powers his interest from December 1, 1964, at 6% per annum as consideration for Powers not fully enforcing his rights under the original note purchase agreement with Penrose (dated July 1, 1962), which would have required the immediate sale of the WPEN stock in December 1964 (par. 1B of P-77). Accordingly, United and Powers, as the two most senior secured parties, seek payment from the collateral of $1,740,000. principal amount of indebtedness, plus interest owed, plus the reasonable expenses and attorneys' fees incurred by them and the trustee, Old Colony, in efforts to realize on this collateral.

Since December 2, 1964, there is no question that Penrose, the Sylks, and the other secured parties junior to United and Powers have had ample notice that first two secured parties wanted to sell the collateral.[3] Powers was also informally in touch with the Sylks throughout the period since December 1964 and for purposes of such communication, the Sylks were both principal officers of the debtor Penrose and junior secured parties as well.

For various reasons, however, the secured parties have been unable to negotiate a contract of sale for the WPEN stock until now. To begin with, the Sylks have generally been opposed to any sale, WPEN being perhaps the most valuable remaining asset of Penrose (see N. T. 6/7/67—60–66). Since May 11, 1965, a Conservator has been attempting to realize the maximum amount from certain assets of Penrose in a capacity similar to that of a common law receiver (Civil Action No. 37995) and has made known his claim to this asset. During this period, WPEN has perhaps been Penrose's most valuable asset and pays the Sylks both a generous salary and rents as a landlord, which one appraiser found to be comparatively high (P-14). WPEN has apparently also been useful during the Penrose insolvency as a guarantor for certain Penrose obligations.[4] Both before and after the Conservator was appointed, having the stock of a radio station as collateral was apparently quite useful for Penrose and the Sylks. F.C.C. regulations prevented the secured parties from controlling the station even though they had the stock [47 U.S.C. § 310(b); see, e. g., Lorain Journal Company v. F.C.C., 122 U.S.App.D.C. 127, 351 F.2d 824 (1965), cert. den. 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966)], and with the stock held by a trustee, junior interests could be created, slotted, or rearranged to provide flexible collateral for many situations. It appears from the testimony and many exhibits that the group of secured parties

---

3. P–10, P–11, P–20, P–26, P–34, P–80, P–81, P–63, P–65.

4. WPEN has apparently guaranteed rent payments to a Penrose landlord (one "P. Carrier," see P–49) and is a guarantor under certain agreements between Penrose and the Conservator (see P–53).

below United and Powers included the Philadelphia Redevelopment Authority, Walter E. Heller & Co., Inc. ("Heller"), Jonas Senter ("Senter"), and the Sylks in a complex of priorities that need not be determined in this decision, but one which shows an additional reason the Sylks wanted any sale delayed if possible.

Against this background of a conservatorship claiming an interest in the collateral and opposition from those who had effective control of the "collateral" radio station, the plaintiffs had to attempt a sale if they were ever to secure repayment of the amounts owed them. After the default notices of December 2, 1964 (P-10), Old Colony and Powers demanded, without success, (P-11, December 11, 1964) that the Sylks honor their agreement of July 1, 1962 (P-78) wherein they had promised personally to purchase the stock of WPEN for $3,500,000. in the event of default.

The plaintiff's next step was to secure a competent appraisal of the value of the WPEN stock. In January 1965 they employed Mr. Harvey of Blackburn and Company, an experienced and highly reputable "media broker" who had made approximately 200 to 250 appraisals in his career.[5] He valued the stock at $5 million.

At a meeting in late December 1964, the Sylks and others agreed to form "Quaker Broadcasting Company" ("Quaker") and purchase the collateral from Penrose for themselves (P-87). Powers who attended the meeting was asked to get Old Colony to delay their efforts toward making any sale. This he did (P-17). On advice from his lawyer in February, however, Powers insisted that the sale be made through Old Colony since there was danger that the Quaker-Penrose deal was not "at arms length" (P-87, P-21) (N.T. 930ff.). The negotiations between Old Colony and Quaker were apparently temporarily fruitless due to the problems facing the Sylks with Penrose creditors and the conservatorship of May 11, 1965 (P-39). The deal had reached the draft stage, however, in April (P-21, P-22, P-23).

During the summer of 1965, interest in the stock was shown by two mid-west groups and a Cincinnati broker in particular. Despite active efforts by Powers to encourage these offers,[6] the fact that stock only (and not assets) was for sale, plus financing problems, soon ended these offers (P-27, P-28, P-30, P-29, P-33).

The alternative of public bidding, or at least bidding by invitation to a limited group, had been considered at the outset in December 1964. The experienced advice of Mr. Harvey was that negotiated sales would bring a higher price given the unique nature of broadcasting properties.[7] In the fall of 1965, however, all active interest in WPEN having waned, the plaintiffs and their counsel again considered the possibility of sale by a limited public offering (DS-15, P-35, P-42, DS-10, DS-11.) This idea was discarded again, however, due to the S. E. C. and other legal problems (P-59, DS-11) and apparently due to a new round of parties interested in a negotiated deal. Powers received one $2 million offer (N.T. 794) and United's counsel was actively negotiating with a party in Philadelphia.[8] Quaker apparently also revived its interest at this time (P-46), although

---

5. Of all the experts produced, Harvey's testimony seems entitled to the greatest weight in light of his significantly greater experience and that of his firm. It should be noted that at least some inadequacy was inherent in any appraisal done by the plaintiffs, since they had an extremely difficult time obtaining the financial information required to be made available under the several pledge agreements. This was part of the relief granted in June 1967 to plaintiffs under Count I of the Complaint.

6. Powers flew to the mid-west and even visited banks to seek financing for one party.

7. See P-13. Public bidding apparently depressed the value of a radio station until the closing because it adversely affected earnings by deterring advertising contracts and depressing employee morale.

8. This prospect subsequently bought a station in Camden.

Powers was sure any Quaker offer would again prove fruitless (DS-15).

In December, Martin W. Field ("Field") and the plaintiffs entered active negotiations and by January 1966 had virtually concluded a deal. The plaintiffs had both formally and informally investigated Field's ability to pay for the stock and were satisfied he could perform his obligations under the contemplated contract of sale. The transaction bogged down, however, when the Sylks threatened to cause a default under the WPEN debenture [9] (DS-23) and the plaintiffs decided that they had to sell both the stock and the debenture together. At this point, the Fields withdrew from negotiations (P-56). During this period, the Sylks continued to press their revived Quaker offer (P-50) but, by the analysis of Old Colony's counsel made in Feb., 1966, their offer did not appear as valuable as the Field offer (P-54). Whether or not the comparison was correct, and it appears that it was substantially accurate, the trustee had to be concerned with the Sylks' involvement with Quaker. Such a sale was potentially one not at arm's length, and with the underlying insolvency of Penrose, Old Colony might be liable to suit by Penrose's creditors and others. Moreover, once Field withdrew, the Quaker offer was not pressed again. As Powers testified (N.

T. 982-83), every time the plaintiffs got active on a sale, the Sylks also would get active. This pattern has continued to date.

During 1966, "tight money" apparently made buyers even less willing (N.T. 989-990). The Sylks and the other principal in Penrose, Jonas Senter, tried to get Powers to delay again [10] while they made some new financial arrangements involving the WPEN collateral [11] and the structure of Penrose [12]. At the end of the year, Powers tried to revive the Field interest (N.T. 1059 ff.) and a limited public sale was again mentioned (P-59).

In late January 1967, the plaintiffs received a second show of interest from Field (P-61, DS-16). They began active negotiations immediately, asked Mr. Harvey to up-date his appraisal (DS-13, P-71), and over the period of three months finally hammered out a contract of sale for both the stock and debenture of WPEN. The ability of Field to consummate such a deal financially was again investigated and found satisfactory by the plaintiffs and their agents.[13] The contract was signed May 26, 1967, and by notice of that date, the debtor was further given until June 7, 1967, to redeem the stock (P-82); all other parties were given additional notice of a sale to take place the same date (P-72). During the February to May 1967 negotiations, the

---

9. This the Sylks could always do, since the pledgees could not interfere with their control of WPEN due to F. C. C. regulations.

10. This is when Penrose agreed to pay Powers interest on his $1,000,000. at 6% from 12/1/64—P-79.

11. See P-7, P-58, DS-8, DH-2, H-2, H-3: a new "slot" was created in August 1966 with Senter as "Trustee," WPEN as collateral, the Sylks and Senter sharing $1,106,240.89, and the Sylks subordinating their prior $1,000,000. loan (DS-8) and their debenture interest (DH-2).

12. N.T. 1033 ff. Apparently this transaction involved the spin-off of a corporation Senter had merged with Penrose several years before (N.T. 1037 ff.).

13. Such investigations included confidential bank checks and use of personal contacts with insurance companies that apparently knew in detail about Field's extensive real estate transactions and holdings. The defendants put great stress on the failure of the plaintiffs to obtain an audited statement of Field's net worth and failure to ascertain ahead of time that Field could qualify before the F.C.C. It does not appear, however, from any evidence or testimony, that an audited statement of personal net worth was the best indication of Field's financial ability; and to the contrary, creditable testimony of experienced businessmen indicated that such information was of less value on a man with Field's activities than a check with the responsible institutions who loaned him money. On the F.C.C. point, it does not appear necessary or proper to anticipate F.C.C. proceedings in this court. The contract of sale is terminated if F.C.C. approval is not secured.

Sylks came forward in April 1967 with another offer, one from "Welcome Radio," for the purchase of WPEN's assets. Although the offer was never put into concrete or final form during the time of these Field negotiations, "Welcome" was apparently also willing to buy stock. During May 1967, the Sylks were not given a copy of the Field contract they sought to use as a model for a "Welcome" offer because the principals would not authorize Old Colony's lawyer to distribute a copy. It was not shown that this failure either caused "Welcome" to withdraw or prevented their making a firm offer for the stock. Rather, it showed the plaintiffs' concern for not allowing the Field negotiations to be undermined, since they were finally close to a sale after over two years of fruitless efforts.

The Field Contract, as finally signed, is a complicated document in detail, yet relatively simple in concept. Since the sale was non-consensual as far as the Sylks, and hence Penrose and WPEN, were concerned, it was impossible for Old Colony, Powers or United to make or obtain any of the warranties that normally accompany such a sale of stock.[14] Furthermore, since the plaintiffs had not been given adequate information of the financial condition of WPEN, provision had to be made for what might turn up which would increase or decrease the value of the station, and the stock, materially.[15] Several items on the WPEN balance sheets listed as assets were advances to the insolvent parent, Penrose. Their probable value was negligible.

Similarly, certain liabilities of the corporation looked as if they could be reduced or eliminated if subjected to an "arm's length" test or renegotiation.[16] To deal with these and similar unknowns, and to allow the purchase price to be adjusted for the changes in WPEN occurring between the most recently available certified financial statements of January 31, 1966, and the closing, the Field contract of sale provided for adjustments and escrows. To facilitate an adjustment for net worth changes, the contract defines certain categories of "deductible assets," and "deductible liabilities."[17] By using these definitions in the contract, net worth, as described by the contract, can be computed by the accountants named in the contract: Peat, Marwick, Mitchell & Co. A second adjustment was provided which would allow commutation of leases should they prove unreasonable or differ from "fair value."[18]

Two escrows were also provided in the contract. The first again had its own contract definitions—"rejectable assets and rejectable liabilities"—and was computed tentatively by the accountants. The second escrow, for "undisclosed liabilities," was a $300,000. escrow to be disbursed at $100,000. a year if such liabilities do not appear. In this fashion, both buyer and seller have protected themselves against the unknowns in this "warrantless" situation. Although defendants have argued that all these provisions in the contract will aid the buyer, it should be noted, for instance, that to the extent "deductible assets" are actually collected in the future, the buyer must

---

14. N.T. 1431, 354. There was testimony that lack of warranties would eliminate prospective buyers (N.T. 262, 350).

15. There was testimony, for instance, that the Sylks had alleged that they took considerable cash out of WPEN (N.T. 6/7/67, 60–66).

16. This included in particular certain leases and salary contracts. Throughout this case, the Conservator of Penrose has indicated that he may challenge the WPEN debenture originally taken down by the Sylks. This challenge, if successful, would lower WPEN liabilities by

$1,980,000. and increase the purchase price Field must pay by the same amount.

17. In essence, Deductible Assets are those acquired in a transaction between WPEN and controlling persons of WPEN. Deductible Liabilities are all liabilities except leases, services to be rendered, and Rejectible Liabilities (being certain future contracts between WPEN and Penrose, Sylk dominated companies and insiders).

18. One appraisal of WPEN, for example, indicated that the Sylks paid themselves as landlords an allegedly inflated rent (P–14).

pay the sums over the seller. Similarly, if WPEN makes profits since January 31, 1967, these two will increase the buyer's price.

Under this contract, simple in concept but difficult to compute under the various definitions, the accountants have prepared a preliminary pre-closing audit based on figures as of January 31, 1967 (DS-6). This gives an accurate idea of what the buyer, Field, is paying for the stock, although, of course, such information may well be subject to some change before the post-closing audit since the Sylks control the operations of the radio station. The purchase price that the plaintiffs will receive under the Field contract is as follows:

(1) $5,000,000. for the fair value of the assets as of their appraisal based on audited statements of January 31, 1965; [19]

(2) plus $22,535.69, the net worth adjustment for changes from January 31, 1965, to January 31, 1966, a total of $5,022,535.69;

(3) minus $169,190., the net worth adjustment as defined in the contract, reflecting the decline in WPEN from January 31, 1966, to January 31, 1967.

This means Field pays $4,853,345.69 for the station if all the figures on the balance sheets represented collectible, enforceable, legal obligations and assets.

The adjustments, however, for the lack of warranties and contingencies explained above, lower the cash paid or delay the cash paid by,

(4) Rejectable Liability reserved $151,636.,

and

19. The most recent statements available when the Field Contract was signed.

20. In other words, it seems impossible that the full lease value of $346,625. will be deducted, or even that a substantial portion of this figure will be found unreasonable. Furthermore, as noted above, the price will go up if WPEN has post-January 31, 1967, earnings, or if Penrose, the Sylks, or other insiders pay back certain sums advanced to them by WPEN.

(5) Escrow for Undisclosed Liabilities $300,000.

Hence $4,401,709.69 represents the total cash to pass hands at once (unless the fair value of radio station WPEN's leases is found to be lower than that computed from previously audited WPEN financial reports).[20]

Item (3) above, Rejectable Liability Reserve, was potentially a $341,880. deduction under the accountant's preliminary computation. Mr. Field, however, clearly stated in court [21] that he waived his right to so segregate $190,244., which represented certain employment contracts, from the cash to be paid at closing. Without otherwise ruling on such contracts, we hereby make our finding conditional on a waiver of this amount being a binding contractual undertaking on the part of Field, enforceable if necessary by parties to this litigation who are not parties to the Field Contract.

Considerable testimony, a great many exhibits, and many pages of briefs concerned the problem of whether the Field price, as outlined above, was a commercially reasonable price. The attack by the defendants was two-fold: (1) the station had not been appraised properly by the plaintiffs' expert, and (2) other parties were willing to pay more for the WPEN stock.

Although the testimony of the defendants' four experts is admissible under our liberal Federal Rules, see e. g., United States v. 60.14 Acres of Land, 362 F.2d 660 (3rd Cir. 1966), the lack of experience of these experts as compared with the plaintiffs' expert and the often highly qualified nature of their valuations entitles their conclusions to less weight.[22] Moreover, two of these experts

21. See N.T. 1294–1298.

22. Expert Gregg was an allegedly willing buyer of WPEN, but in the past he had employed plaintiffs' agent-broker for his own company and in 1965 had termed Mr. Harvey's appraisal of WPEN "fair." The other experts were all employed with the litigation in mind and with the Field and other offers "on the table."

placed greatest emphasis on valuation by "multiplier" of gross advertising billings as derived from other radio station sales. Unfortunately, their derivation of such a multiplier was not from closely comparable sales or situations and two of the experts seemed quite devoid of much experience in the valuation of radio stations in the highest population centers or "markets." Accordingly, the stock appraisal of plaintiffs' expert at approximately $5 million seems both supportable, accurate and commercially reasonable.[23] Furthermore, as to defendants' second line of argument, analysis of the so-called competing "bids" seems to show that the plaintiffs' price was supported by the market place.

The four competing bids so strenuously emphasized by the defendants are difficult to compare with the Field Contract. Their terms vary substantially from each other and from the Field sale. In one form or another all except the Field Contract contemplate consensual transactions —ones in which the Sylks, as the controlling parties of Penrose, bind themselves to cooperation. Furthermore, the other bids likewise demand some consensual re-positioning or re-financing of junior secured parties, including again the Sylks in their dual role as secured lenders to Penrose. A third major difference is that all the competing bids involve "paper," deferred payment that would apparently be accomplished by using among other sources the expected cash flow of WPEN to pay certain junior secured parties.[24] In all instances, evaluating such debt is difficult and the potential deviation of present val-

ue from the principal amount of the debt is quite large in the face of the extremely high interest rates charged in today's market for such financing. It should be noted, also, that the three latest bids also involved purchase of the WPEN stock only, not the stock and debenture the Fields had to agree to buy. All of these factors, especially the presence of various guarantees by the Sylks, would automatically make such a buyer willing to pay more. At the very least, the anticipated costs of litigation are far lower. Nonetheless, the "competing" bids still do not differ substantially from the Field sale.

Briefly, the four competing bids may be summarized as follows:

(1) The "Quaker Broadcasting" offer of 1964–65. Even if this offer was substantially equal to Field's in cash value,[25] it had the almost prohibitive taint (for the trustee-seller) of being an effort by the Sylks to sell WPEN consensually (between Penrose and their new corporation) to themselves (P-87) when Penrose was insolvent. As noted above, there is some question whether the Quaker offer was ever really firm and was not rather a Sylk effort to head off the first round of negotiations with Field in the winter of 1965–66.

(2) The "Welcome" offer of Spring 1967. This is the only other offer to be made before the Field sale which is allegedly for a higher price. Unfortunately, the offer was at most times an offer for assets, and thus impossible to compare since the plaintiffs had only stock and a debenture to sell. Moreover, in its latest and most concrete form,[26] it was a

23. Since the Field contract provides for a substantially equal price, subject only to reasonable adjustments, the Field "price" is similarly commercially reasonable in light of all the expert appraisal testimony.

24. All these "non-cash" deals assume the junior secured parties will agree to take "paper" or can be required to do so. On the contrary, the plaintiffs would seem derelict in their duties if they left junior parties to look to the future performance of WPEN under new management, or the future earnings of some new and strange corporation. Such treatment

by the plaintiffs might itself have been not commercially reasonable in the circumstances of this case. On the other hand, the alleged "third" position is held by the Redevelopment Authority of Philadelphia, a public body, which has maintained that it can and will accept only cash. (N.T. 1882).

25. See P-54, where the problems of trying to fix a cash value to the restructuring of the junior liens are made clear.

26. There is again a substantial question whether Welcome ever made a firm of-

cash offer of only $2,522,000.[27] accompanied by proposed consents of junior secured parties, by $2,800,000. of new debt, and by common stock of a "new" WPEN subsidiary and common stock of the financially insubstantial and smaller corporate-parent buyer (DS-25, N.T. 150–51, P-68, P-70). While the value of such equity stock would be pure speculation, the $2,800,000. face amount of debt would have a considerably lower present value, even assuming the paper was marketable.

(3) The "Milgram" offer, referred to above, was made after the Field Contract was executed, and offers $3,000,000. cash plus a note for $1,020,000. The evidence indicates that such a note would have a present value of approximately $924,410. With further adjustments of approximately $145,000.[28] and placing a present value on the debenture of $1,089,000.[29] the total "cash value" of the Milgram proposal ($4,868,410.) confirms the Field price—both being subject to the same set-offs for worthless assets and undisclosed liabilities.[30] As a matter of evidence, the Milgram proposal confirms the fact that the Field price was at the "market."

(4) The LIN offer of September was made during the trial and in no way was ever a firm offer; it was merely a firm invitation to deal. The cash value of the LIN offer for the stock only is virtually impossible to evaluate, since, as a condition to their $3,500,000. in cash and $3,-000,000. in notes, they demanded the Sylks' consent to cancellation of the debenture and certain other obligations. (DS-18b) It is difficult to assume, for purposes of comparing offers or otherwise, that the Sylks individually or on behalf of Penrose, would give the consents and other warranties required by LIN, particularly in view of the history of the Sylks' opposition to all past efforts to liquidate this collateral by sale to third parties. The valuation of the $3,000,000. note is impossible since the principal amount was subject to set-off for any breach of the extensive warranties demanded of Penrose, failure to cancel the debenture, etc. If such a note had a present value of 50%, the LIN offer would be substantially equal to the Field price, and a qualified expert testified that such a note could not even be marketed as such (N.T. 1988).[31] It should be noted in comparing all four offers with the Field sale that even the defendants' experts

---

fer (C–1, C–1a, P–68, P–69, DS–25); and the proposed consents of junior parties were never obtained.

27. N.T. 1828–29. But at N.T. 1822, Mr. Sylk, an "insider" on the Welcome offer, seemed to say only $1,742,000. in cash was being paid.

28. This includes undistributable earnings of WPEN and Sylk employment contract adjustments, as specified under the Milgram proposal.

29. This debenture was valued at 55% by a clearly qualified expert, assuming that the debenture was free from the right of set-off included in the Milgram offer. It is noted also that Milgram not only was buying just stock, but the debenture was to be delivered free and clear by the plaintiffs and then subordinated to the debt.

30. The Milgram proposal has a far larger sum available for set-off—the full face of the debenture—as opposed to the two Field escrows.

31. The LIN proposal, while requiring the Sylks' rather extensive cooperation as in all the other proposals, was at least the only proposal in which it was clear the Sylks were not potential "insiders" of the offeror or the offering group. See the discussion above and N.T. 1776–77 as to the Sylks' possible status in the Milgram group. Assuming that various junior secured parties would have agreed to deferred payment of their claims, and that the finally negotiated sale to LIN would have contained the required warranties and other undertakings of Penrose and the Sylks (including the cancellation of the WPEN debenture) the LIN offer does appear to offer more "consideration" for the WPEN stock than any other offer in this record. It should be noted, however, that as plaintiffs point out, LIN's heavy debt structure at the present, as revealed in a recent "red herring" (P–88), may cast some doubt on LIN's ability to perform the $3,000,-000. of deferred payment.

testified that the absence of the elements of a sale consented to by the Sylks would either substantially reduce the value of the stock or might even deter any offer at all (N.T. 1129, 1431).

Although this decision determines only the rights of the two most senior secured parties, it is clear from the record that various junior parties have a security interest in the WPEN stock and have so notified Old Colony. Without making any determination as to priorities, it can be noted that Old Colony was aware of a junior lien for at least $800,000. asserted by the Philadelphia Redevelopment Authority,[32] a junior lien of approximately $1,106,240.89 on which Jonas Senter acted as trustee and under which lien position Senter and defendant, Walter E. Heller & Co. both claimed a senior position,[33] and a junior lien of $1,000,000. allegedly held by the Sylks as a result of a loan made to Penrose in 1962, contemporaneous with Powers' original loan.[34] Defendant Heller insists that the senior parties United and Powers satisfy their claims first out of the proceeds of the debenture held by the senior parties, since the debenture is subordinated to Heller's position.

It is also conceded by all parties that sometime in 1963 William Sylk personally paid $181,000. in interest on the senior notes to the senior pledgee (now United), and that his right of subrogation for that amount has been assigned to Heller (DH-1). Accordingly, to the extent that United receives full payment of its claims, the $181,000. in interest it has received and set aside is payable as a senior claim to Heller as assignee of William Sylk.

*Rulings on Requested Findings of Fact*

██ Plaintiffs' Proposed Findings of Fact (Document 77) Nos. 201 through 215, 301, 302, 305, 306, 307 are granted; the words "a competent and adequate" are substituted for "an accurate" in No. 303; No. 308 is rephrased "It is reasonable to believe that Mr. Martin Field has the ability to carry out all the provisions of the Field Contract"; No. 401 is rephrased "The price contained in the Milgram Agreement does not provide sufficient cash to pay all allegedly 'secured' parties and the cash equivalence of the Milgram proposal does not differ materially from the Field price"; No. 402, add "allegedly" before "secured parties"; No. 403 add the phrase "before execution of the Field Contract on May 20, 1967, when" after the word "period." Nos. 303, 308, 401–403 are granted as modified.

Requested Findings of Fact of defendant Penrose Industries (Document 79) Nos. 1 through 5 and 8 are granted; Nos. 6, 7, 9, 10, and 12 are denied; the word "active" is substituted for "any" and the words "seek out another" for "find a" in No. 11, and No. 11 is granted as modified.

Suggested Findings of Fact on behalf of William H. Sylk and Harry S. Sylk (Document 78) Nos. A(3), B(1) (a), B(2), B(11) [substituting "did not" for "omitted to"], C(3) (a), C(7), E(2) (a), and G(3) are granted. Nos. A(2), A(4), A(7), B(1) (b), B(6), B(8), B(10) (b), C(1), C(4), C(5), C(8), C(9), C(10), D(1), D(2), E(1), E(4), E(5), F(1) through F(4), G(1) and G(2) are denied. All others are granted only as they conform to the findings in this opinion and

---

**32.** The brief of the Redevelopment Authority of the City of Philadelphia asserts this lien is approximately $1,100,000. principal amount and also is secured by the Debenture.

**33.** Heller obtained its interest as assignee of interests originally held by the Sylks.

**34.** The plaintiffs estimate at page 89 of their brief that the total amount of liens

against the stock is approximately $4,630,-000. (and some of these liens are also secured by the debenture). Defendants William H. and Harry S. Sylk estimate at page 40 of their brief that the liens against the stock are $3,916,940.40 but describe them as the "first four liens." Defendant Walter E. Heller & Co. in its brief, page 4, describes total liens in the stock and debenture as "well over $4,000,-000. plus interest and costs."

are not conclusions of law; they are denied in all other respects.

B. *Law*

As a matter of law under the contract obligations set forth in the exhibits attached to the Complaint, Penrose is in default under the Senior Note and the Powers Note and has been since December 1, 1964 (see Order of 6/8/67, document 5). Under these same contracts, the plaintiffs have the right to sell both the stock of WPEN and the debenture, and the defendants Sylk have expressly waived their right to urge either the equity of marshalling or any rights they claim by dint of their alleged status as "mere guarantors." [35]

▆ All of the contracts and pledges governing this transaction stipulate that the law of Massachusetts will govern [36] with the exception of the Note Purchase Agreement under which Powers took down his notes subject to the Pennsylvania Uniform Commercial Code (P-77). This stipulation is in keeping with § 1-105 of the U.C.C.,[37] since the location of both Old Colony and the stock certificates in Massachusetts provides a "reasonable relation" to the State of Massachusetts.[38]

The question for decision, therefore, is whether or not the sale of this collateral fits the requirements that the U.C.C. imposes upon secured parties who seek a remedy after default by realizing on pledged collateral. U.C.C. § 9–501. More specifically, at issue here is whether the plaintiffs have satisfied the requirements of § 9–504(3):

"Disposition of the collateral may be by public or private proceedings * * but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. * * * [R]easonable notification of the time and place of any public sale of reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and * * * to any other person who has a security interest in the collateral * * * who is known by the secured party to have a secured interest in the collateral."

and of § 9–507(2):

"The fact that a better price could have been obtained by a sale at a different time or in a different method

---

**35.** See Exhibit G of the Complaint for example, paragraph 8:

"¶ 8. Any holder of Secured Obligations may at any time without impairing or releasing his rights hereunder. * * *

"(b) Sell, exchange, release or otherwise deal with any property by whomsoever at any time pledged or mortgaged to secure the Secured Obligations held by him; * * *

"(d) Exercise or refrain from exercising any rights against the Company and others."

This makes it unnecessary to comment specifically on the several cases cited at pages 17–22 of the Sylks' brief (Document 78) and in the letters of November 29 and December 14, 1967, which have been attached to Document 78. As to such authorities of the defendants Sylk, see pages 3 and 4 of plaintiffs' reply brief (Document 80); and pages 5–7 of brief of defendant Walter E. Heller & Co. (Document 81) together with their letter of December 11, 1967 attached thereto.

**36.** The Senior Stock Pledge stipulated Massachusetts Uniform Commercial Code

(Exhibit A, ¶ 13); the Powers Stock Pledge stipulated "laws of the Commonwealth of Massachusetts" (Exhibit E, ¶ 6); the Senior Debenture Pledge stipulated the Massachusetts Uniform Commercial Code (Exhibit G); and the Powers Debenture Pledge (Exhibit H) incorporated all such provisions by reference.

**37.** M. C. L. A. c. 106, § 1–105; 12A P.S. § 1–105. All citations hereafter to the U.C.C. section number only, since the Massachusetts statute (and that of Pennsylvania) is numbered similarly. See, also, Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927).

**38.** See, also, § 9–102 of the U.C.C., which would by its terms make this transaction governed by Article 9 of the Code, in keeping with the purpose of the Article as found in the comment "to bring all consensual security interests in personal property * * * under this Article. * * *"

from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party *in good faith for the purpose of avoiding or reducing loss and of effective realization* either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. * * * A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable." [Emphasis added for Massachusetts amendment to the official text.]

■ Before reviewing the standards suggested by the U.C.C., it should be made clear that this proceeding is clearly one contemplated by the last sentence of § 9–507(2), which provides for a conclusive determination of commercial reasonableness in a judicial proceeding. The Official Comment, Paragraph 2, points out that in "appropriate cases" it is of "great importance to * * * give the secured party means of getting, by court order * * * approval of a proposed method of disposition as a commercially reasonable one," in light of the attack made possible by § 9–507(1) against any unapproved dispositions. Thus, it is consonant with the U.C.C. that this sales con-

tract be approved by a declaratory judgment.[39] It should also be noted that the announced opposition of the Sylks to this sale and the underlying insolvency or conservatorship of Penrose make this case particularly "appropriate" for a determination of commercial reasonableness prior to multiple direct attacks by various parties.

■ Although the words of § 9–504 (3) seem to grant the secured parties an absolute option of whether to have a public or private sale, it seems unwise to take such words literally. To begin with, the second sentence of § 9–504(3) would at least seem to include within the words "method, manner, time, place and terms" the fundamental choice of public versus private sale, and thus the secured parties must choose between a private or public sale according to which, if either, is the more "commercially reasonable." No particular standards are suggested for measuring this reasonableness, but informative comment may be found in the analogous section in the sales article of the Code, § 2–706, and the above emphasized language in the unique Massachusetts amendment to § 9–507(2) should be considered.

Section 2–706, dealing with a seller's rights and duties to resell, has requirements of commercial reasonableness exactly parallel to those of § 9–504(3), and the Official Comment to § 2–706, paragraph 4, defines "public sales" as "sales by auction," defines "private sale" as including "solicitation and negotiation conducted either directly or through a broker," and states that the option between the two was given to enable "the seller to resell in accordance with reasonable commercial practices so as to realize as high a price as possible in the circumstances."[40] The Massachusetts addition

---

39. Cf. the definition of "action," § 1–201 (1).

40. "4. Subsection (2) frees the remedy of resale from legalistic restrictions and enables the seller to resell in accordance with reasonable commercial practices so as to realize as high a price as possible in the circumstances. By 'public' sale is meant a sale by auction. A 'private' sale may be effected by solicitation and negotiation conducted either directly or through a broker. In choosing between a public and private sale the character of the goods must be considered and relevant trade practices and usages must be observed." [§ 2–706, Official Comment].

to § 9–507, "in good faith for the purpose of avoiding or reducing loss and of effective realization," arguably also adds further standards to "commercially reasonable manner." [41] And to the extent "manner" includes the choice of private or public sale under § 9–504(3), this additional language is relevant.

The record in this case makes it quite clear that the plaintiffs thoroughly investigated the type of sale that would be most advantageous in terms of maximum sales price. They relied upon expert and thoroughly experienced advice from a large media broker that a private or "negotiated" sale would produce the highest price. They rejected a "semi-private" sale of limited bidding because the potential S.E.C. problems increased the costs and liabilities involved [42] and because of the defect of public auctions: having a radio station under such public scrutiny tends to depress the station's value. Not only did the defendants fail to overcome these reasons why a private sale was a commercially reasonable manner of sale, but counsel for WPEN, when arguing against an order compelling assistance in the F.C.C. application, explained quite convincingly how such public scrutiny adversely affects a radio station.[43] In addition, the concerted and admitted opposition of the Sylks to any sale they did not favor made extensive negotiations of the terms of any contract of sale crucial. Such could not take place under any system of limited bids involving several potential purchasers.[44]

Under the third sentence of § 9–504(3), the requirement of reasonable notice, there is no question on this record and in light of the several "notice" cases decided under the U.C.C. that the plaintiffs have fulfilled the requirements of this section.[45] Many notices, both formal and informal, were given to the defendants from December 1964 to May 26, 1967. The 1964 notice alone would have satisfied the requirement of "reasonable notification of the time after

41. An explanation of reasons for the Massachusetts addition was not readily available to the court. The phrase "in good faith for the purposes of avoiding or reducing loss and of effective realization", however, appears to make explicit the good faith requirement noted in the Comment and to use the language of § 2–704(2) which deals with seller's rights to identify goods to the contract. As added to § 9–507 they seem to express over-caution to prevent any sale of collateral that may be "dumping" or some other sharp or unconscionable practice.

42. This is the "public" offering problem, see e. g., United States v. Custer Channel Wing Corp., 376 F.2d 675, 676 (4th Cir. 1967); S. E. C. v. Guild Films Company, Inc., 279 F.2d 485, (2nd Cir.) cert. den. 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed. 2d 49 (1960).

43. Counsel for Penrose argued strenuously during the hearings under Count I that the knowledge a prospective buyer like Field obtained concerning WPEN contracts could be used against WPEN. A limited bid quasi-public sale would only have increased any such jeopardy to the value of WPEN.

44. It is, of course, unclear under the U.C. C. whether such a limited list of bidders sale would be "public" or "private" and,

accordingly, what concomitant duties and rights arise such as notice and the right of the secured party to purchase. These questions, however, need not be decided under our decision in this case.

45. The so-called "notice" cases include Atlas Credit Corporation v. Dilbow, 193 Pa.Super. 649, 165 A.2d 704 (1960) (failure to send out any notice held to be a violation of § 9–504); Alliance Discount Corp. v. Shaw, 195 Pa.Super. 601, 171 A.2d 548 (1961) (private sale set aside for want of notice); Baber v. Williams Ford Company, 239 Ark. 1054, 396 S.W. 2d 302 (1965) (question whether notice was reasonable held to be for jury); also, Fort Knox National Bank v. Gustafson, 385 S.W.2d 196, Ct.App., Ky. 1964); Hudspeth Motors, Inc. v. Wilkinson, 238 Ark. 410, 382 S.W.2d 191 (1964) (notification requirement of § 9–504 demands only that the seller take such steps as are reasonably required to inform the person to be notified "whether or not such other person actually comes to know of it" U.C.C. 1–201 (26)). See Skeels v. Universal C. I. T. Credit Corp., 222 F. Supp. 696 (W.D.Pa.1963), aff'd 335 F.2d 846 (3rd Cir. 1964). See, also, Atlas Construction Co. v. Dravo-Doyle, 114 P. L. 34 (C. P. Allegheny Co. 1962); Third National Bank & Tr. Co. v. Stagnaro, 25 Mass.App.Dec. 58 (1967).

which any private sale * * * is to be made * * *." Moreover, since the notice cases have stressed the importance of § 9–504(3) notice in terms of the debtors' right under § 9–506 to redeem collateral "[a]t any time before the secured party has * * * entered into a contract for its disposition * * *," it is noted that Penrose and the Sylks were also asked to redeem the collateral in December 1964, and then given formal notice that they had ten more days from the signing of the Field Contract on May 26, 1967, to still exercise their right of redemption. The plaintiffs have more than carried their burden of showing reasonable notice.

The core of this case concerns the duties imposed by the second sentence of § 9–504(3) and the standards for measuring compliance with the words "commercially reasonable" that are suggested in § 9–507(2). The phrase "commercially reasonable" appears throughout the U.C.C.[46] Although its technical role may vary from section to section, the basic criteria for evaluating "commercially reasonable" would seem to be consistent. Accordingly, some guidance can be found outside Article 9.[47] In particular, under § 1–205, Comment, Paragraph 6, it is suggested that commercial acceptance makes out a prima facie case that a usage is reasonable and the burden then is on those who attack such usage. The court's role is to prevent "unconscionable or dishonest" practices from becoming standard. Under § 2–706 (which is closely parallel to § 9–504), the lesson of the commentary is that "commercial reasonableness" should not be a "legalistic restriction," although it is the "ultimate test." Such considerations as disposition to "best advantage" and notice varying with "urgency of the matter" suggest a very practical test is needed. But the comment explicitly states that the standard of "in good faith and in a commercially reasonable manner" is intended to be more comprehensive that that of "reasonable care and judgment" that had been established and defined by courts under § 60 of the Uniform Sales Act.[48] This would suggest in the context of the entire U.C.C. that the pragmatic test envisioned must be carefully tempered by the "good faith" requirements of the U.C.C., e. g., §§ 1–201(19), 1–203.

Commentary on Article 9 has convincingly pointed out that "[t]he policy of

---

46. See Mellinkoff, The Language of the Uniform Commercial Code, 77 Yale L.J. 185, 209 ff. (1967). E. g., §§ 2–103(1) (6), 2–311(1), 2–402(2), 2–510(3), 2–609 (1), 2–610(a), 2–614(1), 2–704(2), 2–706, 2–709(1) (2), 2–710, 2–715(1), 3–406, 3–419(3), 7–210(1), 7–308(1), 7–404, 9–318(2), 9–502(2).

47. This reading of the U.C.C. as a whole is reinforced, for example, by the commentary to § 7–210, "Enforcement of Warehouseman's Lien" which has language virtually identical to § 9–507(2). The comment directs comparison explicitly to the sales provision in § 2–706. Of course, the comment to § 9–504 also explicitly states that § 9–504 "follows" the provisions of § 2–706.

48. It is not clear exactly how the Code is supposed to be "more comprehensive" than Sales Act § 60 standards, for example, of "reasonable care and diligence" to secure "the best obtainable price" in a "fair sale * * * according to established business methods," Obrecht v. Crawford, 175 Md. 385, 2 A.2d 1, 8, 119 A.L.R. 1129 (1938); "good faith and with reasonable diligence," C. D. Brown & Co. v. Darling & Co., 241 App.Div. 790, 271 N.Y.S. 407, 408 (1934); "reasonable care and judgment in making a resale," Sheehan v. Braddock Coal Co., 293 F. 573, 574 (1st Cir. 1923); "due diligence" to get "highest price" in "best available market," Atlantic City Tire & Rubber Corp. v. Southwark F. & M. Co., 289 Pa. 569, 137 A. 807, 810 (1927), or "reasonable care and judgment" as a codification of the common law. Howse v. Crumb, 143 Colo. 90, 352 P.2d 285, 289 (1960). It does appear at least that the "honesty in fact" good faith requirement of § 1–201(19) may be one such U.C.C. addition, (see following discussion) and another may be the suggestion in paragraph 6 of the Comment to § 1–205 that the court has some duty to evaluate a "business usage" or practice even if it is widely practiced or accepted. In a sale that satisfies the U.C.C. requirement of "commercially reasonable," an implicit finding is that Sales Act § 60 standards have been met.

Article 9 is to provide a simple, efficient, and flexible tool to produce the maximum amount from the disposition of the collateral." To effectuate this, § 9–504 "attempts to chart a path in the narrow area between two policy positions—one a desire to impede dishonest dispositions, and the other, a reluctance to strangle honest transactions with red tape." [49]

The mechanics of this attempt within all of Article 9 are not quite so simply expressed, however. Comment to § 9–504 states that § 9–507(2) provides "some tests as to what is 'commercially reasonable.'" Although § 9–507 (2) does not make "good faith" explicitly relevant, the Massachusetts amendment to the text and the Official Comment do. Accordingly, the plaintiffs here must have shown "honesty in fact in the conduct or transaction concerned," § 1–201 (19), as well as fulfill the pragmatic tests of commercial reasonableness. The record in this case makes quite clear that plaintiffs have carried their burden of showing their good faith. Their constant attempts to cooperate with the defendants, particularly those attempts of Powers, preclude the showing of any sharp dealing or "unconscionable and dishonest" practices. The defendants' emphasis on Old Colony's counsel not giving the Sylks a copy of a draft of the Field Contract during April and May of 1967 does not militate to the contrary. Field and his counsel had refused to permit the Sylks to see a draft and their refusal, and even any reluctance by the plaintiffs, was amply justified in the face of the Sylks announced opposition to any sale to Field.

The pragmatic considerations under "commercial reasonableness" must relate to "every aspect of the disposition," § 9–504(3), and presumably the list that follows in the second sentence of § 9–504(3)—"method, manner, time, place and terms"—is not exhaustive. The task of analysis, however, is simplified to the extent that the second sentence of § 9–507(2)—"he has sold in a commercially reasonable manner"—offers standards applicable to all aspects of the sale and not just its "manner." Whether this is the proper construction the drafters intended,[50] the Massachusetts amendment to § 9–507, by suggesting additional standards employing the words "loss" and "realization," indicate that the use of "manner" in § 9–507 refers to "every aspect" as phrased in § 9–504(3).[51] The relevant test is thus whether every aspect of the sale is commercially reasonable. It is commercially reasonable if the party (1) acts in good faith, (2) avoids loss, and (3) makes an effective realization. Furthermore, the party may obtain court approval if he (4) sells in the usual manner in a recognized market, or (5) sells at the current price in a recognized market, or (6) sells in conformity with reasonable commercial practices among dealers in the type of property.

Considerations (4) and (5) above are eliminated in this case since it does not appear that there is a "recognized market" for radio stations as this phrase is apparently intended. See, e. g., Alliance Discount Corp. v. Shaw, 195 Pa.Super. 601, 171 A.2d 548 (1961). Consideration (1) of good faith the plaintiff has fulfilled as shown above.

Consideration (6), selling in conformity with, or by employing a dealer (as the Comment suggests) raises the initial problem of defining a "dealer." Not defined in the Code, "dealer" as used in the comment to § 9–507 suggests a person who normally trades in the collateral property as his business.[52] The de-

49. Hogan, The Secured Party and Default Proceedings Under the UCC, 47 Minn. L.Rev. 205, 219–20 (1962), citing Gilmore, Article 9 of the Uniform Commercial Code—Part V: Default, 7 Conf. on Per.Fin.L.Q., 4, 7, 9 (1952).

50. See e. g., Hogan, Bender's Secured Transactions Under the U.C.C., § 8.04, p. 879 n. 84 (1967).

51. See footnote 41, supra.

52. "One recognized method of disposing of repossessed collateral is for the secured

fendants have argued in this case that the plaintiffs violated this section because they did not list WPEN for sale with any established "media brokers." [53] This contention, however, does not deny the commercial reasonableness of the sale for several reasons. First, the brokerage fee would have been approximately $170,-000.[54] Avoiding this cost was quite consistent with the duty to avoid or reduce loss. Second, it is not at all clear that a media broker is a "dealer" as intended by the U.C.C. WPEN itself was not for sale, but rather the stock of a close corporation owning a radio franchise was the collateral.[55] Such media brokers are only rarely "stock" dealers (even assuming that the broker versus dealer distinction does not require a "dealer" to be someone who first purchases what he sells).[56] Thirdly, it was not shown that

plaintiffs lacked their "own facilities for making such [a] sale." They provided considerable exposure of the property to the market, directly,[57] and indirectly through at least two brokers who were approached generally concerning the station. Moreover, Sylk himself testified that he had an offer a month for the station and a list of 35 persons who had expressed interest (N.T. 1756).[58] Finally, this non-consensual sale of stock was not the type of sale susceptible to much assistance from a broker. The thrashing out of the lack of warranties and representations and the insuring against the virtual certainty of litigation would have had to be done by the parties even if a broker had secured an initially willing purchaser. The plaintiffs here may well have saved the debtors a substantial sum of money.[59]

party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales." § 9–507, Official Comment.

53. As the comment to § 2–706 states, however, "A 'private' sale may be effected by solicitation and negotiation conducted *either directly* or through a broker." [Emphasis added.]

54. N.T. 264. The defendants, on at least one occasion, objected to the use of a broker (P–38).

55. Apparently a vast majority of radio sales are "asset" deals, not stock sales. N.T. 263.

56. If buying and selling stations is the mark of a dealer, the closest person to being a dealer was Mr. Gregg of LIN Broadcasting Co., the latest prospective purchaser of WPEN. From the little that was testified to concerning LIN's operations, it was clear that the plaintiffs' efforts in finding buyers were similar to Mr. Gregg's methods in buying and selling radio properties.

57. Although the defendants argued that the plaintiffs failed to show the requisite vigor in seeking or dealing with prospective buyers, it appears from the evidence that at least five named potentials offers were followed up with some diligence. These include "Mid-States Broadcasting" (N.T. 69–71, 787–88); "Crosley Division of Avco" (N.T. 70–74, 788–90, P–32); "Wometco" (N.T. 794); "Wol-

man" (N.T. 82–83, 796, P–43); and "Stevens" (N.T. 84, P–44) in addition to the offers which became more concrete. Other inquiries were apparently handled by phone and referred to Penrose. (N.T. 916–17) *Any challenge to the plaintiffs'* lack of efforts, however, must be assessed in light of (1) the continuing and extensive efforts of Powers to find a buyer, (2) the defendants Sylk and Penrose's opposition to any sale at all, and (3) the caution that even the defendants admitted must mark any efforts because of the conservatorship. (P–87).

58. The plaintiffs did hire a media broker to make an appraisal, so this function of a "dealer," if it is one, was also fulfilled.

59. Of course, § 9–507 and its comment make clear that the suggested methods are not the exclusive path to commercial reasonableness. More than one commercially reasonable sale was probably possible in this case particularly since the commercial transactions involved are so complex. In addition, it was apparent from all the experts' testimony that "potential" was considered the most important single factor in valuing a radio station (and hence its capital stock). Highly qualified men could probably differ significantly on such an assessment of potential and hence there may well have been a number of "commercially reasonable" prices for the sale of the WPEN stock. It was surprising that the several offers were so close in light of the experts' testimony.

The remaining explicit standards of commercial reasonableness must be considered in conjunction with the admonition of § 9–507(2) that a better price obtainable at a different time or in a different manner *is not of itself sufficient* to make a sale not commercially reasonable. In this case, the plaintiffs have introduced extensive evidence that they not only reduced loss and effectively realized on the collateral, but that no higher price was available in May 1967 or before, in a sale of the same method.

As noted above, the choice of a private sale was consonant with the commercially reasonable goal of getting the highest price. But the evaluation of success in obtaining the highest possible price has some limits: initially the one suggested by the first sentence of § 9–507 (2) and in this case the limits wilfully imposed by some of the defendants.[60] Although (as the facts outlined above indicate) the several proposed sales involving the cooperation of Penrose, the Sylks, and other junior parties were at cash prices quite close to the Field sale or lower, even if such offers were at a higher price, as a matter of law it would seem against good commercial practice to force a secured party to realize on his collateral only on the debtor's terms.[61] More collateral than that of radio station stock may bring a higher price if the debtor cooperates fully; but if the debtor chooses to oppose the sale, it would be highly "legalistic" to allow him to defeat a sale under Article 9 by evidence of what price was obtainable with his full cooperation. Under a contrary rule, any collateral of a close corporation, for instance, might lose considerable financial utility, a consequence that seems quite opposed to the very goal of the U.C.C. Accordingly, the Field price is commercially reasonable even if the later Milgram and LIN offers are given a present cash value greater than the Field price. The Field price and the terms of the contract that are unseparable from it are the result of concerted arm's length bargaining and competent legal drafting conducted in a fair and business-like manner.

The other offers are radically different in "method" and sufficiently later in "time."[62] The Field sale satisfied §§ 9–504(3) and 9–507(2) in all aspects; the parties plaintiff have fulfilled the duties required under Article 9 of the U.C.C.[63]

---

**60.** The price difference alleged in this case is significantly different from that found sufficient grounds, in light of §§ 9–504 and 9–507 to allow opening of a deficiency judgment in *Family Finance Corp. v. Scott,* 24 Pa.Dist. & Co.R.2d 587, 109 Pitts L.J. 119 (1961). It should be noted that all parties in this case were sophisticated businessmen who entered these transactions realizing that sales of the collateral might be expected.

**61.** We do not here reach the issue of whether the debtor's opposition violates its duties under the various contracts and pledges with the plaintiffs. There is a substantial chance, however, that extra costs created by its intransigence would be chargeable *to it upon suit* by the secured parties.

**62.** Price offers later in time are of diminishing weight at least for the reason that an offer is already "on the table" establishing a known "floor" as to value. In terms of commercial reality in such situations of no recognized market," if subsequent offers are considered uncritically in determining commercial reasonableness under Article 9, it may well deter parties from stepping forth even with their best aid for such collateral fearing litigation extending by considerating later offers of those waiting to see the initial price negotiated.

**63.** Although the above analysis has been made in terms of the Massachusetts approach to § 9–504(3) in their addition to § 9–507(2), our conclusion is no different under §§ 9–504 and 9–507 as enacted in Pennsylvania. Only the method of analysis varies: a separate consideration of time, place, terms, etc. Under this approach the discussion of the choice of a private sale would cover "method." "Time" and "place" would appear irrelevant touch stones in this particular sale. "Terms" would have to be separated as a distinct legal category, but as the factual analysis of the Field Contract states above, and as the history of the Field negotiations also show, the conclusion that the "terms" are commercially

The application of the relevant law of the U.C.C. involving closely intertwined findings of both law and fact, plaintiffs' requested Conclusions of Law (Document 77) Nos. 101–104, 201–205, 301, 302, 307, 308, 310, 311, 401 and 405; defendant Penrose's requested Conclusions of Law (Document 79) Nos. 1 and 2; and defendants William H. and Harry S. Sylks' suggested Conclusions of Law (Document 78) Nos. A(2), B(1) and C(1) are GRANTED; the form, price, terms, and negotiation of the Field Contract was a commercially reasonable disposition in all aspects, made after reasonable notice, and after an appraisal of the collateral and a financial investigation of the buyer that were equally commercially reasonable in the unique circumstances of this case.

Plaintiffs' and defendants' other requested Conclusions of Law are affirmed only to the extent that they are adopted by the foregoing discussion, conclusions and specific findings. They are denied in all other respects.

In accordance with the discussion with and agreement among all counsel, a final and appealable order will be entered declaring the Field Sale commercially reasonable, and the plaintiffs may submit a proposed order of distribution (including provision for interpleader if desired) of the proceeds realized by the sale, together with claims for interest and expenses as allowed by § 9–504 and the various pledge agreements. In aid of this order, the additional relief requested under Count I will be granted, ordering the appropriate defendants to cooperate fully in preparing an application to the F.C.C. for transfer of control of WPEN to Martin W. Field.

Although defendants have reserved the right to introduce more evidence and arguments upon submission by the plaintiffs of any proposed order of distribution of funds, the present record indicates that defendant Walter E. Heller & Co. has a lien senior to that of Powers to the extent of interest advanced personally by William Sylk to United as payment of interest on the Senior Notes. Similarly, the present record shows Powers has a valid claim for interest on his notes at 6% from December 1, 1964.

After approval of any proposed order of distribution, the balance of any such sums remaining may be paid into court if desired until a subsequent hearing shall determine, as to all remaining creditors and the debtor, the order of distribution.

January 25, 1968

## ORDER

And now, January, 25, 1958, on consideration of the foregoing findings of fact and conclusions of law and the record, it is expressly determined under F.R.Civ.P. 54(b) that there is no just reason for delay in entering final declaratory judgment on Count II of the Complaint and judgment is entered for plaintiffs and against defendants as follows:

The defendant, Penrose Industries Corporation, being in default under various agreements with the plaintiffs (Exhibits A, C, E and see Document 5), it is adjudged that:

(1) The plaintiff, Old Colony Trust Company, is lawfully entitled to sell the capital stock of William Penn Broadcasting Company as collateral security for the obligations of Penrose Industries Corporation under notes held by plaintiffs, United Ventures, Inc. and Gabriel Powers (Exhibits A and B);

(2) The plaintiffs, United Ventures, Inc. and Gabriel Powers are lawfully entitled to sell a debenture of William Penn Broadcasting Company (issued January 31, 1962, Exhibit F) under the pledge agreements between these plaintiffs and the defendants Sylk (Exhibits G and H); and,

(3) The contract of sale of May 26, 1967 (Exhibit I) between Old Colony Trust Company, United Ventures, Inc.,

---

reasonable would not be changed. The Field contract appears a thoroughly reasonable achievement in arm's length commercial bargaining conducted in the fact of many difficult problems.

and Gabriel Powers (Sellers), and Martin W. Field, buyer, for the sale to the buyer of the above stock and debenture held as collateral by the sellers, is a commercially reasonable disposition of collateral as required by Article 9 of the Uniform Commercial Code, including particularly sections 9–504 and 9–507, and is an otherwise lawful contract of sale.